UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Royal Kenneth HAYES,<br><br>   Petitioner,<br><br>v.<br><br>S.W. ORNOSKI, Acting Warden of San Quentin State Prison,<br><br>   Respondent. | Case Number C 01 3926 MHP<br><br>DEATH-PENALTY CASE<br><br>ORDER DISPOSING OF CROSS-MOTIONS FOR SUMMARY JUDGMENT<br><br>[Docket Nos. 31 & 33] |

Petitioner Royal Kenneth Hayes is an inmate on death row in California's San Quentin State Prison. His Amended Petition for Writ of Habeas Corpus contains ten claims for relief for alleged violations of his rights under the Sixth and Fourteenth Amendments.[1] In his final Status Report Regarding Exhaustion of Petitioner's Claim X, Petitioner withdrew Claim X from the Court's consideration. Presently before the Court are the parties' cross-motions for summary judgment on all remaining claims, Claims I through IX. The Court took the motions under

---

[1] The Amended Petition originally contained eleven claims. In his Notice of Confirmation of Withdrawal of Claims, in addition to withdrawing multiple claims contained in his original Petition, Petitioner withdrew what was listed as Claim VIII in the Amended Petition (in which he challenged the trial court's decision to transfer the penalty phase of his trial to Stanislaus County rather than Marin County) and then renumbered the following claims as Claim VIII (asserting unjustifiable delay in state appellate proceedings); Claim IX (alleging cumulative error); and Claim X (referred to by the parties as the *Ring/Apprendi* claim).

submission without oral argument as the parties indicated that oral argument on the motions would not be necessary. As explained below, the Court concludes that Respondent is entitled to summary judgment on Claims I through IX and the Court grants Respondent's motion and denies Petitioner's. Accordingly, subject to reconsideration, the Court will deny Petitioner's application for a writ of habeas corpus and will grant judgment for Respondent.

## I. BACKGROUND

The following recitation of the background of this case is based primarily on the Supreme Court of California's opinion disposing of Petitioner's direct appeal, *People v. Hayes*, 989 P.2d 645 (Cal. 2000). The State court's factual determinations are "presumed to be correct" pursuant to 28 U.S.C. § 2254(e)(1) (2005). In addition, with immaterial exceptions, they are confirmed by this Court's independent review of the record. *Cf. Earp v. Stokes*, — F.3d —, No. 03-99005, 2005 WL 2159051, at *2 n.3 (9th Cir. Sept. 8, 2005).

On or about December 26, 1981, Deborah Garcia dug two shallow holes at a remote location in the forest on the Santa Cruz campus of the University of California and she bought two bags of oyster-shell gardening lime at a garden shop. According to Garcia, she believed that the holes, which Petitioner had directed her to dig, were to be used to hide packages; Petitioner had used such holes in the past to hide packages. Later that day or perhaps the next day or so, according to Garcia, Petitioner telephoned her to meet him on December 29, 1981, so that they could bury the packages.

According to Diane Weller, on December 27, 1981, in Millbrae, California, in the presence of Weller and Lauren de Laet, Donald MacVicar gave Petitioner $160,000 towards $250,000 for cocaine that MacVicar was led to believe would be delivered at a house in a remote location in Santa Cruz. Later that day, Petitioner, who sometimes went by the code name "Penguin," told Weller that she was to accompany him to Santa Cruz two days later to kill MacVicar and Laet with a gun and silencer from a friend in Minnesota that Petitioner was to receive on the intervening day. Larry Dahl arrived in Millbrae from Minnesota on December 28, 1981, with a pistol and silencer from Jim Johnson.

On December 29, 1981, Laet, Petitioner, MacVicar, and Weller drove to Santa Cruz,

where they met Garcia. The five of them then drove to the location in the forest where Garcia had dug the shallow holes. MacVicar and Laet were told that they had to be searched before going to the house where delivery of the cocaine was to occur. Petitioner instructed Weller to remain in the car. MacVicar was led to a tree. Petitioner instructed Garcia to search MacVicar while he leaned against the tree. Petitioner shot and killed MacVicar with a single bullet to the back of the head. Laet then was brought to the site and was shot twice in the head before she died.

Garcia brought Weller from the car to the scene. Petitioner removed the victims' heads and hands from their bodies, and the bodies were placed into the shallow holes that Garcia previously had dug, although the holes had to be enlarged. The oyster-shell gardening lime, which Petitioner believed to be quicklime, was spread over the bodies to hasten decomposition and the graves were covered with dirt, brush, and leaves. The severed body parts were placed in plastic bags and left nearby. Petitioner, Garcia, and Weller later disposed of their clothes, the guns, and other evidence at other locations.

A mushroom hunter discovered fragments of what later turned out to be Laet's skull on February 20, 1982, and law-enforcement personnel began to investigate. On March 10, 1982, Garcia, fearing for her life and for the safety of her family, filed a criminal complaint against Petitioner, contending that Petitioner falsely imprisoned her, assaulted her with a deadly weapon, and threatened to kill her the day before. She also informed the police of her, Petitioner's, and Weller's involvement in the murders. Garcia led the police to the location of the bodies; MacVicar's body was found that day; Laet's was found the next day. A second mushroom hunter found MacVicar's skull on March 18, 1982.

Petitioner was arrested, asserted his innocence, and, after lengthy pretrial proceedings, went to trial in the Santa Cruz County Superior Court on December 3, 1984. The chief prosecution witnesses were Weller, who admitted knowingly aiding and abetting the murders, and Garcia, who claimed not to know that any homicide-related conduct was occurring before MacVicar was shot. Weller and Garcia, each of whom claimed to have acted under Petitioner's domination and to have feared him, testified about their relationships with him (including

significant violence and threats against them) and about various drug-related criminal activities, purportedly involving the Mafia and the CIA, in which they and others had participated with Petitioner over the two to four years prior to the murders.

Diane Edwards, Garcia's mother, was unable to testify at the trial because of her health, so her preliminary-hearing testimony was read to the jury. Edwards's testimony was consistent with Garcia's; in particular, Edwards testified about Petitioner's unusual interest in the discovery of the first skull in the Santa Cruz forest, his request that she collect newspaper stories about the skulls and the investigation, and his subsequent threats against her.

Sondra Johnson, Jim Johnson's spouse, also testified consistently with Weller and Garcia. She recounted the events surrounding her spouse, at Petitioner's request, purchasing the gun and building the silencer that were used in the murders. She stated that it was she who contacted Dahl to have him drive the gun and the silencer from the Johnsons' home in Minnesota to Petitioner in California. Sondra Johnson also testified that she went to Miami to mail an envelope to Petitioner in Hawai`i; this envelope, which she received from Dahl, was found to have contained a letter from Laet, written at Petitioner's direction, that said that Laet and MacVicar were having a wonderful time in Florida and preparing to leave the country. Finally, Sondra Johnson reported that Petitioner had admitted that he killed two people in California whose bodies had been chopped up.

Petitioner's defense was that the murders were committed by Weller, Garcia, and Dahl, who had become the boyfriend of one of the prosecution witnesses between the time of the murders and Petitioner's arrest. Petitioner claimed that he was framed to deflect blame away from Dahl.

On February 5, 1985, Petitioner's jury convicted him of the first-degree murders of Laet and MacVicar and found true a multiple-murder special-circumstance allegation and an allegation that Petitioner personally used a firearm during the commission of the murders. The jury also convicted Petitioner of the March 9, 1982, false imprisonment of and assault with a deadly weapon on Garcia and of possession of cocaine on the date of his arrest, March 10, 1982. The jury was unable to agree on the penalty for the murders.

On May 29, 1986, a jury in the Stanislaus County Superior Court, to which the case had been transferred on Petitioner's motion for a change of venue, returned a penalty verdict of death. The trial court denied Petitioner's motion for modification of the penalty and imposed a judgment of death on August 8, 1986.

During the pendency of Petitioner's automatic direct appeal to the California Supreme Court, Petitioner filed a petition for a writ of habeas corpus with the California Supreme Court, which the court denied "on the merits" in an unexplained order filed on July 21, 1999. The court subsequently affirmed the judgment against Petitioner in all respects in a reasoned opinion on December 23, 1999; it modified its opinion and denied rehearing on February 16, 2000. Petitioner next sought a writ of certiorari from the United States Supreme Court, which denied such writ on November 6, 2000. On October 16, 2001, Petitioner initiated the present action seeking a writ of habeas corpus in United States District Court.[2]

## II. LEGAL STANDARD

The Court shall grant a motion for summary judgment if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "shall not" grant a petition for a writ of habeas corpus on behalf of a person in custody pursuant to a State court judgment with respect to any claim that a State court adjudicated on the merits unless that court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2005).

## III. CLAIMS FOR RELIEF

### A. CLAIM I

The Sixth Amendment guarantees that "In all criminal prosecutions, the accused shall

---

[2] The Court stayed the present action from April 1, 2003, to March 10, 2004, for Petitioner to return to the California Supreme Court to exhaust Claim X in his Amended Petition. As noted, Petitioner has withdrawn that claim from the Court's consideration.

5

enjoy the right to . . . a trial, by an impartial jury. . . ." U.S. Const. amend. VI.  This right is incorporated into the Fourteenth Amendment, which ensures fair trials for criminal defendants with its provision that "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend. XIV § 1; *see Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due process requires that the accused receive a trial by an impartial jury free from outside influences.").  In Claim I in his Amended Petition, Petitioner alleges that he was deprived of his Federal constitutional rights to a fair trial and an impartial jury by the trial court's denial of his motion for a change of venue for the guilt phase of his trial.  The California Supreme Court denied this claim on the merits in its opinion disposing of Petitioner's direct appeal.  989 P.2d at 668-70.

At his arraignment, Petitioner moved for a change of venue from Santa Cruz County. The motion was based on the extensive countywide publicity in the print media and on the radio and television regarding the discovery of the victims' remains, the arrest of Petitioner, and subsequent events.  Petitioner noted that the media had disclosed highly prejudicial information that would be inadmissible at trial, including the facts that Petitioner twice had been acquitted of prior homicides, once on the grounds of insanity, and that the chief prosecution witnesses had passed lie-detector tests.  The trial court denied the motion without prejudice, recognizing that a change of venue would have been appropriate if the trial were to have commenced at the time of the motion, but stating that as time went by there would be less likelihood that Petitioner could not receive a fair trial in Santa Cruz County.

Petitioner renewed his motion eighteen months later after almost three weeks of voir dire of prospective jurors.  Two months after that, Petitioner supplemented his motion with additional supporting materials that reflected current publicity about juror selection, the commencement of the trial, and Petitioner's recent marriage; these materials included local newspaper editorials decrying the amount of money spent on trials for "Trailside Killer" David Carpenter and Petitioner.  *See Carpenter v. Ornoski*, No. C 98 2444 MJJ JL (N.D. Cal. filed June 19, 1998).

The trial court denied the motion the day before trial began.  The judge commented that the exposure to pretrial publicity was less than had been anticipated and that many prospective

1    jurors knew nothing about the case; moreover, the court had passed the selected jurors for cause
2    because the judge was satisfied that the selected jurors would be fair and that those who had been
3    exposed to pretrial publicity recalled very little about the case, would disregard the publicity, and
4    had not formed opinions as to Petitioner's guilt or innocence.

5          In the storied *Sheppard* case, the United States Supreme Court held that "where there is a
6    reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should
7    continue the case until the threat abates, or transfer it to another county not so permeated with
8    publicity." 384 U.S. at 363. A "barrage of inflammatory publicity immediately prior to trial
9    amounting to a huge wave of public passion" may establish such a likelihood. *Patton v. Yount*,
10   467 U.S. 1025, 1033 (1984) (internal quotation marks and citations omitted).

11         This Court's independent review of the record reveals that the California Supreme Court
12   correctly concluded that "substantial evidence supports the ruling of the trial court" in denying
13   Petitioner's motion for a change of venue. 989 P.2d at 669; *see id.* at 669-70 (summarizing
14   evidence). First, while the trial judge expressed concerns about the costs associated with a
15   change of venue—and even apparently considered the costs despite the inappropriateness of
16   doing so—he indicated that such costs would not prevent him from granting a change of venue if
17   there were a reasonable likelihood that a fair trial could not be held in Santa Cruz County;
18   relatedly, there is nothing to suggest that any seated juror had knowledge of or considered the
19   costs of the trial or had any bias because of the costs. Second, contrary to Petitioner's
20   contentions, most of the relevant news coverage was neither lurid nor sensationalistic: indeed, as
21   the State court found, "the print and television media articles were factual, not inflammatory.
22   There was no sensationalism beyond reporting the fact that the heads and hands had been
23   removed from the bodies." *Id.* at 670. Third, "[m]uch of the publicity occurred almost three
24   years before jury selection began" and the publicity was relatively "sporadic." *Id.* As in *Yount*,
25   "this lapse in time had a profound effect on the community and, more important, on the jury, in
26   softening or effacing opinion," 467 U.S. at 1033, for "time soothes and erases," *id.* at 1034:
27   several prospective jurors had moved to the county after the murders; many others had no
28   recollection of reading about or seeing television news coverage about them; few who did recall

1  the initial publicity remembered anything other than nonprejudicial facts such as that the bodies
2  had been found on the University of California's campus in Santa Cruz, that Petitioner's first
3  name is Royal, that mushroom hunters discovered the victims' bodies, or that real estate, drugs,
4  and Hawai`i (where Petitioner, Weller, and Garcia had lived) somehow were involved in the
5  case; and few were aware of Petitioner's prior homicide acquittals, 989 P.2d at 669.

6        The California Supreme Court correctly determined that the trial court's denial of
7  Petitioner's motion for a change of venue of the guilt phase of his trial did not deprive him of his
8  right to an impartial jury at the guilt phase of his trial.  The State court's determination having
9  been correct, Respondent is entitled to summary judgment on Claim I.

10                        B.  CLAIM II

11        In addition to guaranteeing an accused's right to trial by jury, the Sixth Amendment
12  provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted
13  with the witnesses against him. . . ."  U.S. Const. amend. VI.  This right, like the right to trial by
14  an impartial jury, is incorporated into the Fourteenth Amendment's Due Process Clause.  *Pointer*
15  *v. Texas*, 380 U.S. 400 (1965).  In Claim II in his Amended Petition, Petitioner alleges that he
16  was deprived of his Federal rights to due process and of confrontation by the prosecution's
17  invocation of Dahl's Federal conviction to bolster Weller's[3] credibility and to insinuate
18  Petitioner's guilt.  The California Supreme Court denied this claim on the merits in its opinion
19  disposing of Petitioner's direct appeal.  989 P.2d at 681-82.

20        During her opening statement, the prosecutor told the jury that it would hear evidence
21  about Dahl's involvement in the events leading up to the murders and that Dahl had been
22  convicted in Federal court of transporting firearms.  Petitioner did not object to any statement in
23  this part of the opening statement.  The prosecutor subsequently asked Weller several questions
24  regarding her past testimony against Dahl at his trial for transporting firearms.  When Weller said
25  "yes" in response to the prosecutor's question as to whether Dahl subsequently had been

---

[3] Although the text of Claim II in the Amended Petition states that "Petitioner was deprived of his Federal rights of due process and his right of confrontation by the prosecution's invocation of Larry Dahl's Federal conviction to bolster *his* credibility and to insinuate Petitioner's guilt" (emphasis added), it is clear from the discussion of this claim that it is Weller's credibility that is meant.

1  convicted, Petitioner objected to Weller's response as hearsay. The trial court sustained the
2  objection.
3        In discussing this claim, the California Supreme Court reasonably "infer[red] that the
4  confrontation claim is based on the hearsay nature of the evidence that Dahl had been convicted."
5  As that court correctly noted, "The [trial] court immediately sustained the hearsay objection" and
6  Petitioner "was afforded the opportunity to confront and cross-examine Weller." *Id.* at 682.
7        Petitioner contends that Weller's testimony that Dahl was convicted following her
8  testimony against him bolstered her credibility because it suggested that another jury believed her
9  prior testimony. However, by sustaining the objection, the trial judge removed this statement
10 from consideration by Petitioner's jury. Moreover, even assuming misconduct on the part of the
11 prosecutor and assuming that the jury considered Weller's statement despite the sustaining of the
12 hearsay objection, the jury already would have had to find Weller credible in order to give this
13 statement any credence; if the jury did so, the statement could not have served to bolster Weller's
14 credibility further; if the jury did not do so, then the statement would have been disregarded;
15 either way, the statement necessarily had no effect on the jury's determination of Weller's
16 credibility. Thus, this Court's independent review of the record confirms that the California
17 Supreme Court correctly concluded that "[t]he possibility that the jury may have concluded that
18 Weller was truthful in her testimony regarding [Petitioner] because another jury convicted Dahl
19 after her testimony about delivery of the gun is too remote to warrant the inference of prejudice"
20 that Petitioner would draw. *Id.*
21       This Court agrees with the State court that "[t]here was no Sixth Amendment violation"
22 here. *Id.* A fortiori, Respondent is entitled to summary judgment on Claim II.

### C.  CLAIM III

24       In Claim III, Petitioner alleges that he was deprived of due process and a fair trial by the
25 trial court's refusal to declare a mistrial after Weller improperly volunteered a statement about
26 being the object of a murder-for-hire plot. The California Supreme Court denied this claim on
27 the merits in its reasoned opinion disposing of Petitioner's direct appeal. *Id.* at 678.
28       On the second day of Petitioner's trial, defense counsel raised a question with the trial

9

court about a reference the prosecutor had made to an alleged jailhouse informant. The prosecutor said that the alleged informant's attorney had stated that Petitioner had "offered money in the sum of $50,000 to do away with two witnesses in the case," but the prosecutor did not feel that this information was sufficiently reliable to use it at trial. The trial judge then instructed the prosecutor, "Don't use it for any purpose."

The prosecutor subsequently asked Weller why she had not gone to the police about the killings when she was in Minnesota and Petitioner was elsewhere. Weller responded that she was scared that Petitioner would have her killed. When the prosecutor asked whether she had received any actual threats, Weller stated that Petitioner had threatened to kill her if she ever said anything about what happened in California. Weller then volunteered, "a day or two after Jim Johnson was arrested, Sondra Johnson said there was a contract out on me for $25,000 from Kenny Hayes." Defense counsel immediately objected to the volunteered statement as hearsay. The prosecutor argued that the statement was not hearsay because it was being offered not for its truth but to show that Weller believed that she had reason to fear for her life. The trial court sustained the objection and told the jury that the volunteered comment "should be stricken from your minds."

After the jury was excused, Petitioner moved for a mistrial on the ground that the jury heard the volunteered statement, which was highly prejudicial and virtually impossible to rebut. Defense counsel referred to the trial court's prior ruling that information about contracts not be used; the judge indicated that that ruling had to do with the alleged jailhouse informant or Petitioner's past history as a contract killer. The judge noted that the volunteered statement was "very prejudicial" and "the worst kind" of hearsay, but concluded that "I sustained the objection on that basis. I don't think it would justify a mistrial or as grounds for a mistrial."

Petitioner relies on *Dudley v. Duckworth*, 854 F.2d 967 (7th Cir. 1988), and *Mason v. Hanks*, 97 F.3d 887 (7th Cir. 1996), in arguing that the trial court's refusal to declare a mistrial denied him a fair trial. However, *Dudley* and *Mason* are inapposite, as the trial courts in those cases admitted challenged testimony as evidence over objections by defense counsel; in Petitioner's case, the trial court sustained defense counsel's hearsay objection. While Weller's

10

1  volunteered statement was highly prejudicial, the trial court's admonition to the jury to strike the
2  statement from their minds likely cured any prejudice resulting from the statement.
3  　　　　There is no support for the claim that the trial court was required to declare a mistrial
4  even after excluding Weller's hearsay testimony; thus, the California Supreme Court correctly
5  denied Petitioner relief on this claim.  Respondent is entitled to summary judgment on Claim III.
6  　　　　　　　　　　　　　　　　D.  CLAIMS IV AND V
7  　　　　In Claim IV, Petitioner alleges that he was deprived of his Federal constitutional rights of
8  confrontation by the trial court's refusal to permit him to call Garcia's attorney to impeach her
9  regarding motive and bias.  In Claim V, Petitioner argues that he was deprived of due process
10 and a fair trial by the prosecution's knowing use of Garcia's false testimony.  The California
11 Supreme Court denied these claims on the merits in its opinion disposing of Petitioner's direct
12 appeal.  989 P.2d at 678-80.
13 　　　　At Petitioner's trial, the prosecutor and defense counsel asked Garcia questions about
14 when she received immunity from prosecution.  She responded, "Before the preliminary hearing,
15 I believe in 1982," and "I thought . . . it was just before the preliminary, but I could be mistaken."
16 Garcia also testified, in response to a question put to her by the prosecutor, that she did not recall
17 whether or not she or someone acting on her behalf sought anything from the police or the
18 district attorney's office other than protection.
19 　　　　During the presentation of the defense case, Petitioner's trial counsel filed points and
20 authorities describing Garcia's testimony about the timing of the prosecution's offer of immunity
21 to her, her denial that she or any agent of hers sought immunity for her, and her inquiry to an
22 attorney as to why she needed it.  He sought leave to call Garcia's attorney to impeach Garcia,
23 arguing that Garcia had testified regarding what was or was not said during her relationship with
24 the attorney, without objection, thereby waiving the attorney-client privilege.  Petitioner's
25 counsel made an offer of proof that the attorney had spoken to an attorney in Petitioner's
26 counsel's firm stating that he had told Garcia that she needed immunity because she faced
27 prosecution and execution for first-degree murder, and that he had negotiated for immunity with
28 the prosecutor for several months before it was granted by the trial court.  The trial court ruled

that there had been no waiver of privilege, that the attorney would not be permitted to testify, and that the subpoena would be quashed.

Petitioner contends that Garcia's allegedly false testimony regarding immunity permitted her to appear to be testifying simply to tell the truth, thereby bolstering her credibility, when the reality was that she was testifying to avoid being charged herself with the crimes for which Petitioner was standing trial. However, Petitioner's argument assumes that Garcia denied that she had been granted immunity; in fact, Garcia testified that she had received immunity; she merely stated that she did not recall whether or not she or anyone associated with her sought immunity before it was offered to her and that she believed—but acknowledged that she "could be mistaken"—that she received immunity shortly before Petitioner's preliminary hearing in November 1982 rather than shortly after Garcia's first statement to the police in March of that year. As the California Supreme Court recognized, "nothing in the record . . . would establish either that Garcia testified falsely or that the prosecution knowingly permitted her to do so," *id.* at 680; this is confirmed by this Court's independent review of the record. Moreover, even assuming falsity, Petitioner fails to demonstrate how Garcia's attorney's testimony would have had any impact on the jury's verdict of guilty. Finally, as the record reveals, Petitioner "was not denied the right to, and in fact did, thoroughly cross-examine Garcia. The ruling he challenges here did not restrict his right to confrontation and cross-examination. It precluded only the presentation of other evidence to impeach Garcia on a collateral matter." *Id.* at 679 n.15.

The California Supreme Court correctly denied Petitioner relief on these claims. Accordingly, Respondent is entitled to summary judgment on Claims IV and V in the Amended Petition.

### E. CLAIM VI

In Claim VI, Petitioner asserts that he was deprived of due process and a fair trial by the trial court's approval of allegedly unnecessary security procedures that conveyed to the prospective jurors that Petitioner was dangerous and frightening. The California Supreme Court denied this claim on the merits in its opinion disposing of Petitioner's direct appeal. *Id.* at 680-81.

After hearing from law-enforcement officers responsible for court security and for maintaining custody of Petitioner while he was confined in the Santa Cruz County jail, the trial court permitted, over defense objection, the posting of additional deputies and the screening of all persons who entered the courtroom in a manner similar to that used at airports. Prospective jurors were screened until the actual jury was selected; jurors subsequently were not screened.

The United States Supreme Court recently held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck v. Missouri*, 125 S. Ct. 2007, 2012 (2005). However, "the deployment of security personnel during trial is not the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Id.* at 2011 (internal quotation marks and citations omitted). The security measures employed at Petitioner's trial were not of a kind that required the trial court to determine specifically whether or not they were appropriate at Petitioner's trial. *See Holbrook v. Flynn*, 475 U.S. 560, 569 (1986) ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable."). Nevertheless, the trial judge permitted the security measures only after hearing specific "concerns that [Petitioner] might escape and for the security of witnesses who allegedly had been threatened. . . ." 989 P.2d at 680 n.16.

The California Supreme Court correctly observed that the record "suggests that those prospective jurors who were questioned about the subject during voir dire viewed [the screening] as a routine procedure like that at an airport," *id.* at 680, and that "[n]o juror who actually sat on the case is identified as being a person who believed that the security precautions were instituted because the defendant was dangerous," *id.* at 681. Thus, that court correctly concluded that Petitioner "has not demonstrated actual prejudice, and we find nothing in the description of the security measures utilized at his trial . . . that is so inherently prejudicial as to warrant a conclusion that in reaching a verdict the jurors might have been affected by their observation of

those measures." *Id.*

The security measures used at Petitioner's trial were appropriate; thus, the State court correctly denied Petitioner relief on this claim. Accordingly, Respondent is entitled to summary judgment on Claim VI.

### F.  CLAIM VII

In Claim VII, Petitioner contends that he was deprived of due process and a fair trial by the trial court's refusal to instruct that Garcia was an accomplice as a matter of law. The California Supreme Court denied this claim on the merits in its opinion disposing of Petitioner's direct appeal. *Id.* at 682-84.

The California Penal Code requires that the testimony of an accomplice be corroborated. Cal. Pen. Code § 1111 (West 1985). As Petitioner observes, a State trial court in California may and must instruct that a prosecution witness is an accomplice as a matter of law only where the evidence requires that as the only reasonable inference: as the State court explained in denying Petitioner relief on this claim, "whether a witness is an accomplice is a question of fact for the jury in all cases unless there is no dispute as to either the facts or the inferences to be drawn therefrom." 989 P.2d at 682 (internal quotation marks and citation omitted).

Petitioner contends that the trial judge erred in not instructing the jury that Garcia was an accomplice as a matter of law; as a result, the jury did not find corroboration of Garcia's testimony beyond a reasonable doubt, thereby depriving Petitioner of a fair trial. *Cf. Carmell v. Texas*, 529 U.S. 513 (2000). However, this Court's independent review of the record confirms that Garcia credibly denied that she knew of Petitioner's intent to kill: this fact compels the conclusion that it actually would have been erroneous for the trial court to instruct that Garcia was an accomplice as a matter of law because the evidence as to whether she was an accomplice was ambiguous. Moreover, Garcia's testimony was corroborated by Sondra Johnson's testimony regarding the delivery of the murder weapon, Petitioner's instructions to mail the letter written by Laet from Florida to Hawai`i (to try to cover up the murders), and Petitioner's admission that he killed two people in California whose bodies had been chopped up, along with Edwards's testimony demonstrating Petitioner's interest in and response to the discovery of the first skull

14

and the ensuing investigation.

The California Supreme Court correctly determined that the trial court was not erroneous in refusing to instruct that Garcia was an accomplice as a matter of law. Accordingly, Respondent is entitled to summary judgment on Claim VII in the Amended Petition.

### G.  CLAIM VIII

One component of the Fourteenth Amendment's guarantee that a person may not be deprived of life or liberty "without due process of law," U.S. Const. amend. XIV § 1, is the Sixth Amendment's provision of a criminal defendant's right "to have the Assistance of Counsel for his defence," U.S. Const. amend. VI. *Gideon v. Wainwright*, 372 U.S. 335 (1963). "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759 (1970). In addition, "[w]hile the Sixth Amendment guarantees the accused a speedy *trial*, excessive delay in the *appellate* process may also rise to the level of a due process violation." *Coe v. Thurman*, 922 F.2d 528, 530 (9th Cir. 1991) (emphasis on original). In Claim VIII, Petitioner asserts that he has been deprived of the effective assistance of counsel and appellate due process by an unjustifiable delay in the state appellate proceedings.

The California Supreme Court received Petitioner's judgment of death and docketed his automatic appeal on August 26, 1986. The court appointed H. Peter Young, Esq., to represent Petitioner on December 10, 1986. The record-completion proceedings were concluded on January 13, 1993, when the certified record was filed. Young requested and received numerous extensions of time to file Petitioner's opening brief on appeal before the court relieved him of his appointment on April 4, 1995. The court subsequently appointed Eric S. Multhaup, Esq., on July 16, 1995.[4] Multhaup filed Petitioner's opening brief on July 31, 1997.

The period from the initiation of the automatic appeal to the filing of Petitioner's opening brief lasted nearly eleven years. Petitioner concedes that four of the years used for the record-completion process plus the two years that Multhaup used to prepare the opening brief (for a total

---

[4] Multhaup continues to represent Petitioner in the present federal habeas proceedings pursuant to an order of this Court on November 5, 2001, appointing him nunc pro tunc to October 15, 2001.

15

of six years) were reasonable uses of time. However, he contends, the three additional years used for the record-completion process plus the two subsequent years during which Young conducted substantial work on Petitioner's appeal but did not produce a draft brief—a total of five years—constitute an unjustified delay, due in part to the ineffective assistance of counsel, that denied him appellate due process; as a result, Petitioner experienced "oppressive incarceration pending appeal" as well as "anxiety and concern . . . awaiting the outcome of the appeal," *id.* at 532.[5]

Assuming without deciding that Petitioner's appellate due-process rights were violated as Petitioner contends, the remedy in a habeas proceeding would be an order "that the petitioner be released unless the appeal is heard within a set time," not, as Petitioner urges, that he be granted a new trial. *Id.* However, Petitioner already has had his appeal heard and denied; the Court therefore is unable to provide a remedy for the alleged violation. Accordingly, Respondent is entitled to summary judgment on Claim VIII.[6]

### H.  CLAIM IX

In Claim IX, Petitioner asserts that he was deprived of due process and a fair trial by the cumulative effect of the multiple errors he has identified at the guilt phase of his trial. The California Supreme Court denied this claim on the merits in its opinion disposing of Petitioner's direct appeal. 989 P.2d at 693. This Court, like the State court, has "concluded that no prejudicial error occurred." *Id.* There having been no prejudicial error, there is no cumulative effect of errors, and Respondent is entitled to summary judgment on Claim IX.

### IV.  DISPOSITION

The Court has determined that Respondent is entitled to summary judgment on the remaining claims in Petitioner's Amended Petition for Writ of Habeas Corpus, Claims I through IX. Accordingly, the Court grants Respondent's Motion for Summary Judgment on these claims

---

[5] Petitioner initially argued that Young's ineffective assistance and the delay in the appeal also impaired Petitioner's "grounds for appeal or . . . the viability of his defense in case of retrial," *Coe*, 922 F.2d at 532. However, in his brief replying to Respondent's opposition to his motion and opposing Respondent's motion, Petitioner concedes that there was no such impairment.

[6] Petitioner is not entirely without the prospect of a remedy for the claimed violations of his appellate due-process rights: while he may not obtain habeas relief, he may bring a suit for damages pursuant to 42 U.S.C. § 1983 (2005). *See Badea v. Cox*, 931 F.2d 573, 574 (9th Cir. 1991).

1  and denies Petitioner's Motion for Summary Judgment on these claims.

2      Petitioner shall file any motion for leave to file a motion for reconsideration of this order
3  pursuant to Civil Local Rule 7-9 not later than thirty days after receipt of this order.  If Petitioner
4  files such a motion, Respondent shall file any response not later than thirty days after Petitioner's
5  motion is served.  The Court will take the motion under consideration upon receipt of
6  Respondent's response or upon the expiration of the time for Respondent to respond.

7      If Petitioner does not file a motion for leave to file a motion for reconsideration within the
8  time specified, the Court will deny Petitioner's application for a writ of habeas corpus and render
9  judgment for Respondent forthwith.

      *It is so ordered.*

13  DATE: October 26, 2005

    _____
    MARILYN HALL PATEL
    United States District Judge

1  Copies of Order e-mailed on _____ to:

2  Eric S. Multhaup, Esq.
   Twenty Sunnyside Avenue, Suite A
3  Mill Valley, CA 94941

4  Bill Lockyer, Esq.
   Lloyd G. Carter, Esq.
5  Office of the Attorney General
   2550 Mariposa Mall, Room 5090
6  Fresno, CA 93721

7  Habeas Corpus Resource Center
   50 Fremont Street, Suite 1800
8  San Francisco, CA 94105

9  Federal Court Docketing
   California Appellate Project
10 101 Second Street, Suite 600
   San Francisco, CA 94105

18

Case No. C 01 3926 MHP
ORDER DISPOSING OF CROSS-MOTIONS FOR SUMMARY JUDGMENT
(DPSAGOK)